Good afternoon, Council. Good afternoon. My name is Gabriel Fontes. I'm here on behalf of the Appellant, Mr. King. The State has filed a motion to cite additional authority, Carpenter v. United States. Are you aware of that motion, Council? I am aware of it. I was served with that in a timely fashion. Any objection to the courts granting that motion? No objection. We don't think it changes the scales at all. Well, we'll ask you to comment on it, but at this time, then, the motion is granted. Thank you. You may begin. So, a few issues to discuss with the Court today. Begin with the Court's, in Mr. King's view, erroneous denial of the substitution of judge motion. So that motion was filed under 114.5a. That's an enactment of the General Assembly that provided for an automatic right of substitution within the first 10 days after assignment to a trial call, if the motion complies fully with statute. Here, the motion was filed within the 10 days. It complied fully with the statute. There was no substantial ruling. There was no testing of the waters. And so that motion should have been granted. What do you mean there was no substantial ruling? Are you saying that the ruling that the Court made concerning the records that it allowed in was not substantial? It's not a substantial ruling for purposes of that statute. It's a discovery motion. The State has presented not a single case that suggested that any discovery motion could potentially be substantial under that statute. It was telephone and cell site information that, as far as we could tell when we looked at the record, was never used during the case in chief.  As a result of ruling on that motion, did the Court not review some records and some information about the case? There was a written motion that the State filed, and then there was an oral argument on the 17th of July of 2014. An oral argument concerned whether or not the State's procedure that they wished to proceed under was a constitutional procedure. The issue was whether they needed to go through the relevant and material to an ongoing criminal investigation standard under 2703D, or whether they needed to establish probable cause and obtain a warrant. There was a comment in the record, supplemental to 30, in which the State basically said it felt very confident that it could get a warrant if it wanted to. So it was purely an issue of constitutional criminal procedure as to whether or not the State should obtain this discovery, which the Court said it could. There's no case we've seen anywhere in Illinois that has said that a ruling like that on a discovery issue not related to the merits could be a substantial ruling. How is that not related to the merits if, indeed, the trial court had to at least consider in deciding whether to grant the motion information about the case? As far as how courts have treated what related to the merits means, I point the Court to the case we cited in our brief, the Erler case, in which that case said it was not related to the merits because it had nothing to do with the defendant's guilt or innocence. It had nothing to do with any topic that would have tipped off the defense or defense counsel as to how the judge might be leaning. It was completely unrelated to the merits. So it's your testimony that then they just waited until the Court had ruled on that motion and then made the decision? Well, I don't think we have in the record precisely when that decision was made. We know that the motion itself under 114.58 was filed on the 18th, which was the following day. And we know that the motion that has given rise to the State's opposition to the substitution was a motion that the State filed, not the defendant. The defendant did oppose that motion. The defendant did cite an 11th Circuit federal case that said that the different procedural route had to be followed than the one the State wanted to. Just not a substantial issue, just not a merits issue at all. No case has so helped. This Court, if it were to so help, would be the first Court in Illinois to do that. And I would respectfully point the Court to the Walker decision that says you've got to literally construe that right in order to give it effect, because it's rooted in the defendant's constitutional right to a fair trial and impartial judge. When you have an automatic SOJ, as you have here, an automatic substitution judge, isn't that generally heard by the judge hearing the case? My understanding is that the automatic SOJ is heard by the judge hearing the case within the 10 days of that judge having a trial call. Correct. So that is my understanding. Why was this heard by a different judge? My understanding from the record, it was the same judge that heard that motion. He just put his number instead of his name on the order? I'd have to look at the order again. It was Judge 42 that signed this. I'm very certain that it was the same judge who made that ruling. So I hope that was responsive to the Court's question. Thank you. If I can talk a little bit about testing of the waters, it would be very much a far-reaching decision for any court to say that someone was testing the waters when it wasn't even their motion that was filed that the Court had ruled upon, and where someone were to say, well, if someone else files a motion, you're testing the waters if you oppose it. We have no case. But why would it matter? I mean, they had the information after the ruling. So, I mean, they could have used that information to then decide that this is not the judge they want to hear the case. I mean, it wouldn't really matter who filed the motion, would it, counsel, once you knew the Court's ruling? Your Honor, I think it would matter because the testing of the waters doctrine, which, as we all know, it's a judge-created doctrine that has limited the General Assembly's automatic substitution right that they put in 114.5a. And the idea of the testing of the waters doctrine is to prevent any party, in this case the defendant in the criminal case, from forum shopping. And so it would be forum shopping if, within the first 10 days, I filed a motion to dismiss the indictment because I believe the statute under which I was being prosecuted was somehow unconstitutional, the case ought to crumble, it ought to go away, because I don't see how sympathetic that judge is to me, to my leanings, and I get a ruling where the judge denies the motion. I've got a basis then that I went out and obtained. I tested the waters. That's the paradigm for that doctrine. Correct. But if the State files a motion and it's a substantial ruling that the Court makes, are you still precluded from that 10-day automatic SOJ? I don't know of a case that has ever held that. I think if we assume for the purpose of argument that the answer to Your Honor's question is yes, that there wasn't a testing of the waters but a substantial ruling happened, that the defendant allowed a substantial ruling to happen, that that may well cut off the defendant's substitution right. But that's not what happened here. Well, even here, I mean, the day the State files the motion, you could go in with an SOJ before the motion is heard and say, hey, I'm filing a motion for substitution, period. But you didn't. The defense counsel still had the 10-day period within which to do that, still could have done that. And I think there's a case that the court heard a motion which he found was a substantial ruling. So my response to your scenario is all you have to do to cut off a substantial ruling and not get yourself in a pickle, as you feel you might have here, is just to file the SOJ immediately, right? That would have been a more protective approach. But the fact that counsel did not follow that approach does not cut off the right. Again, Walker is telling us to liberally construe that right, to give it its maximum effect. And so to come up with a scenario in which the other side files a motion, it gets ruled upon. And then we're really gyrating a little bit, Your Honor, to determine that that's a substantial ruling because it's a discovery ruling. We know from the Burks case that discovery rulings are not considered substantial. And we know of the very erudite brief that the State filed. It doesn't cite a single case to the effect that a discovery ruling could be substantial. So it just wasn't, Your Honor. Well, we know, though, that the motion that the State filed was filed only three days after the assignment to Judge Halleck. And then the motion for substitution was seven days afterwards and just four days after the State sought that order. So we aren't talking about a long period of time. I mean, we're within the time limit, although after the ruling on the motion. That's exactly right, Your Honor. Did you have the ability to get two SOJs on this case or no? I don't think you can get two. I think you can only get one. An extra murder, I believe, allows the statute allows two. It's not in the collection. But two motions, you can name two judges. Correct. And that happened here. Yes. Okay. Turning for a minute to the issue of the crime scene analyst, you indicate, and I believe concede at page 23 of your opening brief, that Mr. Seperic may be qualified as a crime scene analyst, that is, as an expert. And so then how was the defendant prejudiced here by Seperic's testimony as to the cause of death? His qualifications as a crime scene analyst or as a former police officer or FBI profiler would not qualify him to give an opinion as to whether or not the decedent, in this case Mrs. King, was manually strangled. And that's the opinion he was allowed to give over objection. Well, in Illinois, is it always required that the cause of death be proved by medical evidence? It isn't, is it? Well, it may not be, Your Honor. But I think the issue here is what were the parameters, what were the proper parameters around this expert's testimony? We've not said, we've not argued that he had to be a doctor. We've not argued that he had to go to medical school or have a degree. But we've noted that commonly experts in this field, forensic medicine, commonly do have those qualifications. Why? Because it's a very, very complicated area. Particularly this case gives us a vivid illustration of that, where there is a so-called triad of symptoms that Dr. Kolelkar identifies. And Dr. Bloom says, you know, there's reasons that explain each of those. And then there's three or four things, like bulging eyes, bruising on the neck, damage to the neck tissue, pulmonary edema, that we would typically see in a strangulation, and we don't. So it was a complicated issue. And I point the Court to the Perry case as well as the Park case. So Perry made very clear this was the case where Dr. Stein, the Cook County medical examiner, had testified that the death of a child in a bed with its mother was not an accidental death. And that opinion was based on whether the mother could have heard the child struggling, would have awakened during her sleep. And he had some experience with child abuse. He had an interest in child abuse. He co-authored some presentation about it. And the Perry Court said that's not enough. He may be a medical examiner. He can testify to causes of death. But he cannot testify to whether this particular factual circumstance involved an accidental death or not, whether she would have been awakened by the child struggling. And the case went on to say that expert testimony can tend to overpersuade. And that the more complicated the issue is, the more rigorous study that area requires. The greater the risk that if you put somebody with a more limited range of experience before a jury, and it might even be somebody who has more experience or knowledge than an average juror, but if you put somebody with a too limited range, you run the risk. You run the risk of, in the court's words, tainting the entire fact-finding process. That's exactly what happened here. But this man had years of experience. I mean, I don't have the record. It reflects what his experience was. The court looked at that. He was qualified as an expert based on his experience. So how does that affect what you just argued? His experience was as a former police officer in the city of Davis, California. He then went on to work for the FBI in this behavioral analysis unit where he sometimes consulted on cases. He did studies with respect to manual strangulation on women. Of elderly women. And he never told the court, the State never elicited, just how many manual strangulations he had ever investigated. That never came out. The jury was never told what his experience really was with manual strangulation. And if I'm investigating manual strangulation and the coroner tells me that my victim passed away from being strangled, I have various avenues of investigation. I'm going to talk to witnesses. I'm going to talk to family members. I'm going to find out where people were in those final hours. But I'm probably not picking apart the medical examiner's conclusion that she was or was not strangled. So the idea that he has vast experience, or not even vast, but any kind of substantial experience with forensic pathology is just not well-founded in the record, Judge. So we pointed that out. Your Honor asked me how else was he prejudiced. And I want to pivot, if I can, to the opinion that the crime scene was staged. I see my time's up. Now, go ahead and answer that question, please. Okay. Go ahead. So this staging opinion essentially was that the person who Safarek postulated was responsible for Mrs. King's death had tried to throw law enforcement off. He had tried to arrange the scene in a way that distanced himself from Mrs. King and that ultimately tried to make it look like the person who had done this put the body on the tracks or not, excuse me, tried to make it look like Mrs. King had gone out running and had fallen on the tracks or whatever and been hit. Those are all impressions directed at the mindset of the purported offender, the mindset of the decedent. And I want to really commend the State of Illinois for calling the Court's attention to the Mertz case because I feel decided, I hope in a brief, it's a very interesting case. It's an arson murder in which an expert testified that the nature of the crime indicated anger on the part of the defendant and surprise on the part of the victim. Mr. Safarek said something very similar to that in this case, that Mrs. King was surprised. That's how she was overcome when she was strangled. And, Judge, the Supreme Court said that was error to do that because anyone off the street could have made inferences from crime scene observations. That's knocking down the jury's can. It should never have gone to the jury. It turned out to be harmless error in that case, but it was error. But here, didn't the trial judge adequately protect the defendant from prejudice when he prohibited Safarek from directly testifying that the defendant was Kathleen's killer? I mean, from any type of profiling testimony. I would respond to that by saying that it was a proper and valiant effort on the part of the Court to limit Mr. Safarek in that matter, but in practice it didn't work because in practice he talked about those impressions, about looking inside the mind of the killer, looking inside the victimology of the victim. And I commend the Court, I urge the Court to take a look at Mertz because Mertz really said that's not something you're supposed to be doing. And the State itself on page 14 of his brief said that this was harmless because any jury would have figured that out anyway. Well, if they would have figured it out anyway, what was it doing in front of the jury coming out of the mouth of an expert? Absolutely Mr. King was prejudiced, Your Honor. I've gone way over. I'm happy to answer any questions. Thank you. You'll have time on rebuttal. Thank you. Ms. Joseph. Good afternoon, Your Honors. Good afternoon. Why don't we start right where Mr. Fuentes left off. If this was harmless and the jury would have figured it out, why even use an expert like this to speculate? Isn't that the job for the trier of fact? And is this testimony that is beyond the ken of an average juror? Well, the trial judge held that it was beyond the ken, especially in addressing the photographs of the scene of the crime. There were a lot of unusual circumstances involving this death that did not make it appear like a natural cause of death. So walking through a lot of those issues did assist the jury with more knowledge than the average person would have. But the pathologist testified to that aspect of the case as well, though. There was testimony from the pathologist as well. It did not go into full depth, and obviously the state wanted to put on the best case they could, knowing that there were, as the expert was thoroughly cross-examined on, issues with her autopsy protocol, that they obviously wanted to address any holes that there might have been. So between the two, they were able to discuss how this was not an accidental death. But is that, I mean, again, I'm going back to what an expert testimony is for. It's to assist the trier of fact in understanding the testimony. He's not helping them understand the testimony. He's explaining to them what he feels the testimony shows. Isn't that the job of the prosecutor, in closing argument? In closing argument? Takes all the fun away. Obviously the prosecutor is supposed to synthesize everything that came together and make their argument as to what they believe it means, what the state believes it means. Here, he was providing more than mere generalizations about the scene. He was trying to connect the actual specific facts at the scene. When you have, especially when you have conflicting experts coming in that are giving varying explanations, the jury is not in as strong of a position to make all of the determinate. It is not all within their personal knowledge. It's a battle of the experts, as we typically do. It is. It is a battle of the experts. So they bring somebody in to explain, to break down the experts. Is this scientifically reliable, this testimony? Well, it wasn't based on any scientific methodology. It was based on observations using many of the same observations made by the experts in the case. Does it have to be scientifically reliable to be admissible? No, it does not, Your Honor. They, experts can base, if it is based on a scientific methodology, then you do have to consider whether a fry hearing is necessary because it has to be thoroughly tested. But that is not required in every case there is an expert because not every expert is basing their opinion on scientific methodology. But really, under what authority can we hold that someone who had the qualifications Mr. Sferak did, an ex-police officer, FBI profiler with some training courses, how can we hold that someone like that is qualified to opine on the cause of death? I mean, even if he were qualified as an expert, isn't that beyond his qualifications? Well, the qualifications were thoroughly vetted twice in this case, both in the motion in limine and, again, at trial. And there is, as Your Honor pointed out, there is no requirement that one must have medical training or be a forensic pathologist to make an opinion on the cause of death. Here we have a person who presented far more training and qualifications than the cases cited by Defendant and Perry and Park. Park, there was absolutely no qualification whatsoever beyond possibly one time the officer got correctly identified marijuana. So you're looking at their total training and expertise, which at the admissibility stage before the trial judge did consider what his curriculum vitae was, did consider his report, did consider the fact that he did have specific expertise in manual strangulation. And at that point, the standard is an abuse of discretion. And here there was. It is not so improbable or arbitrary that the trial judge admitted this testimony. So if the trial judge admitted it thinking it may have been probative, here we've got two board-certified pathologists who could not agree on the cause of death. The State produced no eyewitnesses to the death. So in light of this, how was Mr. Safaric's opinion as to the cause of death not prejudicial? I mean, did the court go through the Lerma weighing of probative value versus prejudicial effect? And especially in light of the defense here, that there was insufficient proof that Kathleen died of a criminal agency. Why was this not highly prejudicial? And how is it harmless? It is harmless because, as Your Honors and counsel pointed out, you did have other testimony about these things from which the jury could draw the conclusion. Oh, so you're saying it is cumulative. It is cumulative, Your Honor, but prejudicial. That was the question, if you would get back to the question. Right. Prejudicial issue. Right. How is this not highly prejudicial in light of what I had just talked about, what the defense was here, and the conflicting testimony that two board-certified pathologists could not agree on the cause of death? Because as the Supreme Court did hold in Merckx, when the testimony is essentially cumulative of the other testimony in the case of the other witnesses and the inferences drawn by the expert could be drawn by the jury, as defendant is arguing are common-sense things that the jury could make, then that is where harmless error comes into play. So that is where it is harmless. So if it's harmless, it's not prejudicial? I mean, how do we make this analysis here? And isn't your harmless error argument really an argument that the jurors could understand this evidence and, therefore, really it wasn't needed? As a secondary argument, as an alternative argument, yes, Your Honor. It is harmless because that is part of the harmless error, that it was cumulative and, therefore, it wasn't needed. And certainly if it's prejudicial, then it shouldn't have been admitted, though. Again, harmless error comes after the determination that it was improperly admitted. You don't address harmless error until you make that finding. Let's assume it was error, and let me ask you this for purposes of the prejudicial argument. But this witness, what was his expertise? What was his specific area of expertise? He was, I believe it was crime scene analysis. Is there a difference between making observations as a witness and pointing them out and then rendering his ultimate conclusion? That based on all of that, this was a manual strangulation done by someone who knew her and knew her patterns and habits. I'm sorry. Can you repeat that question? Sure. Thank you. What's the difference between this witness making observations based on his experience? This, I think, is important. That's important. This is of significance. And then the ultimate conclusion of saying that based on all that, it's my opinion that she was strangled, it was done manually as opposed to by pressure or ligature, and that it was done by someone who knows her, knows her patterns, and knows her habits. I mean, tell me how that is not prejudicial, especially when he was admonished that he can't say it was, make any reference to the defendant. And he didn't make any reference to the defendant. Well, let me show you. You can show the inference. The only person that knows her, knows her habits, knows her patterns, that was pretty much a backhanded pointing directly at the defendant, contrary to how the State was ordered to proceed. And we just keep getting back to this. Tell me how that is not prejudicial. Well, of course, any evidence leading to the inference that it was the defendant is going to be prejudicial, Your Honor. That is not highly prejudicial because based on the overall evidence in this case, that was not the only evidence that was leading to his conviction. And that's part of what you're looking at. Again, there are the three tests of harmless error, and one of them is not contributing to the conviction. One of them is that it's cumulative of the other witnesses. And I'm sorry, the other one is not at the tip of my tongue. One of the bases that Mr. Sparck had for testifying that Kathleen was killed in her residence was that the leafy matter on her body came from the vegetation at her residence. Isn't that pure speculation, counsel? I mean, given the fact that the State never introduced any evidence that the matter on her body was the same as found in the residence, the record doesn't contain any reference to any linkage. No, the record contains that it was tested and nothing conclusive could be determined from the leafy substance. I don't recall specifically whether that was the only linkage to why he believed she was killed in her home, but the other evidence was how she was dressed was in a complete state of disarray. She would not have left the house dressed as she was to go out for a run or otherwise. There is, I can think of no reasonable explanation why a woman would leave the house in her state of appearance, both with a bra that was above your nipples, with pants that were loose, with a twisted sock that you don't correct in your shoe. There is, and without your contacts or glasses, that your own child testified that they saw you wearing at all times. Let's turn to the motion. You asked, you moved to cite additional authority. Could you share with us, with the court, why Carpenter v. United States, the United States Supreme Court opinion from June 22nd of this year, why is that relevant to your counsel? Okay, the people are going to begin by looking at, we have two sets of types of motions and events. We have those that are deemed not substantive and those that are deemed substantive. What happened in this case does not quite fall squarely within any published case in this state. Are you talking about the substitution? Yes. The substitution motion here. Yes. This before this court. Yes. Okay. The courts in this state have found what is not substantive are ruling setting dates, scheduling trials or hearings, allowing continuances. Setting a date on a collateral issue, that was the earlier case in which they asked for a competency hearing. The court found that that was a civil matter, did not involve the guilt or innocence, and was completely collateral, was not substantive. The discovery motion cases were Burt and the ruling on those, those were a non-party motion to quash a subpoena and a motion for protective order. And, again, the court found those were tangential amendments that did not go to the merits. And Delta Oil, which is a motion for protective order and a motion for attorney's fees and costs relating to discovery. What has been found substantive are pretrial rulings of law, the challenge to a constitutionality of a statute under which a defendant is prosecuted, and rulings on a motion to suppress. Carpenter is relevant because the argument raised in Carpenter almost mimics the challenge to constitutionality that was raised by the defendant in this case. In Carpenter, the procedural posture was the defendant filed a motion to suppress, arguing that the records, the cell phone data, was obtained contrary to the Fourth Amendment and the right to privacy. That is also the challenge that was raised below. So between both addressing, and once that challenge was raised, the court first had to address what essentially became the equivalent backside argument to a motion to suppress, before then being able to rule on whether the evidence was sufficient to support the reasonable suspicion under the federal statute. I just lost you. I'm sorry about it. Go back a few sentences here. Why did the court here have to, you said something about the backside of a motion to suppress. The argument on the constitutionality, challenging the constitutionality, was equivalent to that which was a motion to suppress, that eventually ended up before the Supreme Court in Carpenter. Well, that was that instead of a court order, they needed a warrant. Yes, that is what Carpenter said. So that was the equivalent of a motion to suppress. The constitutional challenge raised by a defendant in this case required such a ruling that was equivalent to the ruling required in a motion to suppress. So if it would have gone one way, you would have had a different motion. If it had gone another way, you may, so it may have led to a different ruling down the road. It may have moved on this. But it became addressing the motion for the cell phone data became this two-prong process in first addressing an argument similar to that which appears in a motion to suppress. Our courts have continually found that to be a substantive ruling, as well as then ruling on the quality of evidence presented to then meet the standard of the statute. So while we may not have the landmark case under which this falls, the people assert that this is closer in line to the substantive motion such as the motion to suppress and a pretrial ruling on law. Okay. Thank you. Are there any other questions? No. Thank you very much. Mr. Fuentes. Thank you, Your Honor. The fact that the discovery motion that was filed by the State had some constitutional dimension to it, as we've seen demonstrated now four years later in the Carpenter case, doesn't change a thing about it not being a substantial ruling. I want to try to unpack a few other things counsel said in argument. This introduction of Sepharic's testimony for the cause of death, the strangulation, absolutely, the court's absolutely right that that was highly, highly prejudicial. It was unfairly prejudicial for the reasons we discussed, that the cases, including Perry, have said that you can detain the fact-finding process by putting somebody in front of the jury whose experience is too limited to give that kind of opinion on that kind of subject. And I think it's very analogous to Perry. He's got almost no experience actually determining causes of death in homicides, let alone strangulation. So it's very similar. It wasn't cumulative. I don't know. I've read his record many times. I don't know of a single other witness in this case who walked up there and said, I'm an FBI profiler, or I was one. I was a homicide detective. I've done studies. I've consulted on research. Well, Dr. Boone testified to some of the information about how the body, the deceased body, was found and some of those details of the scene. So I interpreted what counsel said as referring to that. And maybe I misinterpreted, but what I was trying to say was it's not cumulative. There's no one else who walked up there and said this was a strangulation. The only person who did that was actually Sepharic at Colell Park. And Sepharic was a little bit of a classic vouching witness, because if you look at what he said he relied on, he said he relied on Colellkar's opinion. That's not a proper basis for someone to testify. Colellkar's opinion, by the way, we want to talk about unfair prejudice, the evidence was very much in equipoise, if not tilted in Mr. King's favor on these two experts, because Dr. Colellkar doesn't even write down on her autopsy protocol that it was strangulation. Does asphyxiation mean the same thing or encompass strangulation, counsel? It does not mean quite the same thing. There are multiple different ways people can be asphyxiated. I can be asphyxiated if I'm working on my car and the jack falls and it crushes me. Manual strangulation is very specific. She didn't write that down, and Detective Peck testified that at the autopsy, she, Colellkar, told him that the result was going to be inconclusive. And at the trial, because there's all of a sudden manual strangulation. So, Judge, it was a weak opinion. It was an equivocal opinion. It was very much like the opinion she herself delivered in the Ehrler case, which is a Supreme Court case decided in 2004. So, again, highly prejudicial, not cumulative, and certainly not harmless. I want to help the Court a little bit with that because we talked about the Merz case where allowing the expert to testify to something that is within the jury's ken was held to be harmless error. In the Merz case, there were, according to the opinion I read, there were four separate statements by the defendant, and many hadn't set the fatal fire. Very different case from this one, Judge. As the Court pointed out, many, many shortcomings of the State's proof. How do you respond to those several other courts that accepted Safaric's testimony? Safaric's testimony? Yes. I suppose I would point to the New Jersey case, which is State v. Fortin. That case was cited by our Illinois Supreme Court in the Merz case as a reason not to allow this type of testimony. I also think you can look at some of those other states, particularly Wisconsin. There's a Swope case in Wisconsin, and the standard's different. The standard in Wisconsin is more relaxed. But if you apply the standard under Clark and Perry, you can't do it. So, in closing, what I'd like to say is I think this is a case about following rules and how rules were not followed here. Rule number one, you get an automatic right of substitution, and you don't develop it in five ways around that right. And that's what the State and the trial court did here. Rule number two, the expert has to be qualified. He wasn't here. That rule was violated. Rule number three, it's got to be within the jury's ken. The State admits on page 14 it wasn't. And rule number four, which we didn't talk about in my opening, but I'll mention, the State allowed the witnesses to dwell on the family member's pain and suffering, which we all agree was horrible. But the cases are unequivocal that that's not allowed. It invites the jury to decide the case on an impromptu basis. And finally, in closing argument, the State actually tried to define reasonable doubt. And it tried to define reasonable doubt by saying, jurors, reasonable doubt, you can still have questions. And then they said, you can have questions as long as it doesn't amount to reasonable doubt. What is a juror supposed to make of that? How is a juror supposed to figure out what that means? Our courts, this Court, the Supreme Court, have all said, don't even go there. So respectfully, Your Honor, Your Honors, this is a clear case for reversal because reversal needs to be a consequence for not following the rules denying the defendant fair doubt. Thank you. Thank you very much. Thank you, Counsel, for your arguments this afternoon. The Court will take this matter under advisement and vendor a decision.  Thank you.